UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WILLIAM DeVILLE                                    CIVIL ACTION

versus                                             NO.  07-1345

THE REGIONAL TRANSIT                               SECTION: E/3
AUTHORITY ET AL

## RULING ON MOTIONS

The following motions are before the Court: a Rule 12(b)(6) motion to dismiss (r.d. #10) and a "renewed" motion to dismiss (r.d. #39) by defendant Regional Transit Authority ("RTA"); a Rule 12(b)(6) motion to dismiss (r.d. #11) and a "renewed" motion to dismiss (r.d. #40) by defendant Mark  Major ("Major"); and a Rule 12(b)(6) motion to dismiss and/or for a more definite statement (r.d. #13) and a "renewed" motion to dismiss and/or for a more definite statement (r.d. #44) by Transit Management of Southeast Louisiana ("TMSEL").  All motions were considered on the briefs without oral argument.  For the reasons that follow, the motions are granted in part and denied in part.

## BACKGROUND

This matter arises from the termination of William DeVille's ("DeVille") employment by the RTA/TMSEL, where he worked in various capacities for approximately 22 years.[1]  DeVille claims that his termination was in retaliation for his communication with the United States Department of Transportation ("USDOT") Office of

---

[1]The background facts are taken from DeVille's Complaint, r.d. #1, filed March 3, 2007, and his First Supplemental and Amended Complaint and Jury Demand, r.d. #20, filed June 19, 2007, and public records.

Inspector General criticizing the RTA administration regarding its management of financial issues.

The RTA is a political subdivision of the State of Louisiana pursuant to La. R.S. 48:1651 *et seq.*[2] RTA contracted with TMSEL[3] to provide administrative and management services for RTA. In October of 2002, DeVille was named General Manager of RTA/TMSEL. On August 29 2005, Hurricane Katrina and the subsequent flood destroyed the New Orleans public transportation system owned and operated by RTA/TMSEL. By October of 2005, the Federal Transportation Administration ("FTA"), through the Federal Emergency Management Agency ("FEMA"), had entered into the Emergency Ground Transportation Contract ("EGTC") with RTA, providing $47,000,000 (forty-seven million dollars) in emergency funding to assist RTA in rebuilding and operating the public transportation system in New Orleans. Beginning in October 2005, DeVille was asked to communicate with the USDOT Office of Inspector General regarding RTA financial issues, including the financial management of the EGTC.[4]

---

[2]The purpose of RTA is to administer, operate, and/or contract for a public transit system within the metropolitan area, although it actually functions only in Orleans Parish (the City of New Orleans). La. R.S. 48:1654.

[3]According to the records of the Louisiana Secretary of State, TMSEL is a private business corporation.

[4]The Complaint does not identify the person who asked DeVille to undertake that task.

On June 14, 2006, an article written by Frank Donze appeared in the *New Orleans Times Picayune*, reporting on the agenda for the upcoming June 16th RTA board meeting.  The article included the following report on proposed changes in the RTA's top management:

> The proposal that the RTA board will consider also recommends a change in the agency's top management
>
> Under the plan, General Manager Bill Deville would move into a new position: director of capital recovery.  Deville would be replaced by Mark Major, the RTA's deputy general manager for finance and administration.
> ....
> Deville has come under fire from several RTA commissioners who have questioned his decision to extend a contract with Creative Risk Controls, the agency's longtime insurance claims administrator, without board approval.  Privately, some RTA officials also have called attention to a $175-an-hour agreement Deville signed with a consulting firm that provides advice on how to get along better with board members.
>
> Reiss[5] said the proposed change in Deville's responsibility has nothing to do with his relations with other board members.  Reiss said the new job title will allow the RTA to capitalize on Deville's working relationship with Federal Transit Administration officials as the agency attempts to slowly rebuild its inventory of flooded-out buses and streetcars.[6]

---

[5] Jimmy Reiss was Chairman of the RTA board of directors.  As Chairman, he had recommended DeVille's appointment as General Manager in 2002.  He resigned as Chairman on June 21, 2006, five days after the board refused to approve further reductions in personnel and routes as recommended by Reiss and a consultant's study, at the June 16, 2006 board meeting.

[6] RTA Memorandum in Support of Motion to Dismiss (RTA memo), Ex. "B".

At the RTA board meeting on June 16, 2006, DeVille was appointed to the position of Executive Director of Capital Recovery for RTA at his prior salary of $125,000 annually, and Mark Major was named to replace DeVille as General Manager of RTA, with an increase in salary from $100,000 to $125,000.  DeVille claims that his appointment was pursuant to a fixed term consultancy contract for at least 2.5 years at full pay and with full RTA benefits, full pension and $700.00 monthly car allowance, and termination only for cause.  He claims that the contract was approved by the RTA board on June 14, 2006.[7]

DeVille alleges that in September 2006, Mark Major (and/or others) caused the RTA Information Systems Department to search his emails for all electronic transmissions to any federal agencies, specifically searching for emails between DeVille and the USDOT Office of Inspector General.  He claims that through their search of his emails, Major and the RTA knew that on September 18, 2006, he had met with Mary Thomas and other agents of the Office of the Inspector General.  DeVille claims that he reported to the Office of Inspector General that the RTA's refusal to computerize its financial management "caused the appearance of corruption" and "resulted in the financial mismanagement of RTA's tax funds

---

[7] Amended Complaint, ¶¶71, 72.

provided by the City of New Orleans" and of the funds provided to the RTA through the EGTC, all of which "negatively impacted the operation and recovery of the RTA."[8]

DeVille further alleges that during September 2006, at the direction of the board members, RTA board counsel Sundiata Haley personally directed him to "chill" and not communicate or have any interaction with any government officials concerning RTA operations.[9]  On September 21, 2006, he received a letter from Barbara Major, Acting Chairperson of the RTA board, advising that he was "to cease and desist all actions and communications, whatsoever, on any matters concerning public transit operated by the Regional Transit Authority, RTA and/or Transit Management of Southeast Louisiana, TMSEL, until further orders from the Board of Commissioners of the Regional Transit Authority."[10]  On October 20, 2006, DeVille was notified by letter from Mark Major, written on TMSEL letterhead, that he was terminated from his employment at RTA effective at 5:00 p.m. that day.[11]

On October 27, 2006, the *New Orleans Times Picayune* published another article written by Frank Donze, regarding DeVille's

---

[8]Complaint, ¶16.

[9]Complaint, ¶23.

[10]Amended Complaint, ¶64.

[11]Complaint, ¶26; Amended Complaint, ¶66.

termination, which included the following statements:

> Bill Deville, the Regional Transit Authority's
> former general manager, has been fired four
> months after he was demoted amid criticism
> from RTA board members for signing contracts
> without their approval, RTA officials
> confirmed Thursday.
> ....
> Former RTA Chairman Jimmy Reiss removed
> Deville from the general manager's position in
> June following months of criticism by other
> RTA commissioners, who questioned Deville's
> decision to extend a contract with Creative
> Risk Controls, the agency's longtime insurance
> claims administrator, without board approval.
>
> Privately, some commissioners also said they
> were angered by a $175-an-hour agreement
> Deville signed with a consulting firm, which
> was to provide advice on how to get along
> better with board members.
>
> At the time, Reiss said the shake-up in the
> RTA's top management had nothing to do with
> his relations with other board members.[12]

DeVille claims that his termination was in retaliation for his
exercise of his First Amendment right to freedom of speech.  He
filed suit alleging damages for violation of his civil rights
pursuant to 42 U.S.C. §1983; for breach of contract under state
law; for defamation under state law; and in his Supplemental and
Amended Complaint (filed in response to TMSEL'S first motion to
dismiss or for a more definite statement), for violation of his
procedural due process rights and equal protection rights pursuant

---

[12]RTA Memo, Ex. "B", copy of *New Orleans Times Picayune* article dated
10/27/06.

to 42 U.S.C. §1983.

As an initial matter, DeVille did not file oppositions to Mark Major's motions to dismiss.  In his opposition to RTA's and TMSEL's renewed motions to dismiss, r.d. #49, he advises the Court that he does not oppose dismissal of all claims against Mark Major in his individual capacity.  Accordingly, DeVille's claims against  Mark Major in his individual capacity will be dismissed.

<u>**ANALYSIS**</u>

Dismissal of a complaint pursuant to F.R.Civ.P. 12(b)(6) is proper only if the pleadings on their face reveal beyond a doubt that the plaintiff can prove no set of facts that would entitle him to relief, or if an affirmative defense or other bar to relief appears on the face of the complaint.  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).  In <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955 (2007), the Supreme Court restated the accepted pleading standard: "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." <u>Id.</u> at 1968  The Court explained that the language in <u>Conley</u> "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival."  <u>Id.</u> (citations omitted).  The court must also assume that the allegations in plaintiff's complaint are true, and must

-7-

resolve any doubt regarding the sufficiency of plaintiff's claims in his favor. <u>Fernandez-Montes v. Allied Pilots Ass'n.</u>, 987 F.2d 278 (5th Cir. 1993). Nevertheless, a plaintiff must plead specific facts, not mere conclusional allegations, to avoid dismissal for failure to state a claim. <u>Collins v. Morgan Stanley Dean Witter</u>, 224 F.3d 496, 498 (5th Cir. 2000). A complaint may be dismissed if it fails to allege an element of a claim necessary to obtain relief. <u>Blackburn v. City of Marshall</u>, 42 F.3d 925, 931 (5th Cir. 1995). A court may consider materials attached to or referenced in the Complaint, such as the minutes of the RTA board meetings. Fed. R. Civ. P. 10(c); *see also* <u>Collins v. Morgan Stanley Dean Witter</u>, 224 F.3d 496, 498099 (5th Cir. 2000). A court may also take judicial notice of public facts - for instance, press reports and "recorded board meetings" referenced in a complaint. Fed. R. Evid. 201(f); <u>Lovelace v. Software Spectrum, Inc.</u>, 78 F.3d 1015, 1018 (5th Cir. 1996).

## I.

Section 1983 does not create any substantive rights, but is merely a vehicle whereby a plaintiff can challenge actions by governmental officials. <u>Shewbridge v. El Dorado Irrigation District</u>, 2006 WL 3741878, *4 n.8 (E.D.Cal.). To establish a § 1983 violation, a plaintiff must demonstrate two elements: (1) that the plaintiff was deprived of a right or interest secured by the

-8-

Constitution or laws of the United States; and, (2) that the deprivation occurred under color of state law. Dow v. Rains County Independent School District, 66 F.3d 1402, 1406 (5th Cir. 1995) citing West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 2254 (1988).

To succeed on a claim of employment retaliation in violation of one's Constitutional and federal statutory rights under § 1983, a plaintiff must prove each of the following elements: (1) he suffered an adverse employment decision; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) causation. Modica v. Taylor, 465 F.3d 174, 179-80 (5th Cir. 2006), citing Johnson v. Louisiana, 369 F.3d 826, 830 (5th Cir. 2004). "'Whether the speech at issue is on a matter of public concern is a question of law that must be determined by the court.'" Modica, 465 F.3d at 180, quoting Salge v. Edna Indep. Sch. Dist., 411 F.3d 178, 184 (5th Cir. 2005).

There is no dispute that RTA is a state actor. DeVille alleges and TMSEL denies that it is a state actor. For reasons that will become evident in the following discussion, the Court need not decide whether TMSEL is a state actor. Whether DeVille's dismissal was a deprivation of his Constitutional right to freedom of speech is another matter.

In <u>Garcetti v. Ceballos</u>, 126 S.Ct. 1951 (2006), the United States Supreme Court considered whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties.  <u>Id.</u> at 1955. The respondent, Ceballos, was a deputy district attorney for the Los Angeles County District Attorney's office.  <u>Id.</u>, at 1955-56.  In his capacity as a calendar deputy, he was called upon to examine an affidavit used to obtain a search warrant in a pending criminal proceeding.  Ceballos determined that the affidavit contained serious misrepresentations, which he discussed in a telephone conversation with the warrant affiant.  When the conversation did not produce an explanation satisfactory to Ceballos, he relayed his findings to his supervisors and followed up with a "disposition memorandum" recommending dismissal of the criminal case.  The trial court in the criminal case held a hearing on defense counsel's motion to traverse the warrant.  After testimony by Ceballos regarding his observations about the warrant affidavit, that court rejected the challenge to the warrant.  Ceballos was subsequently reassigned to another position, then transferred to another location, and denied a promotion.  He sued asserting a claim for retaliation pursuant to 42 U.S.C. § 1983.

Garcetti argued that Ceballos' memo was not protected speech. <u>Id.</u>, at 1956.  The district court granted Garcetti's motion for

-10-

summary judgment based on its conclusion that the memo was written pursuant to his employment duties and its contents were not protected by the First Amendment.  The Ninth Circuit reversed.  The Supreme Court granted certiorari.  The Supreme Court carefully analyzed its past First Amendment cases, and observed:

> Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provisions of public services.  Cf. *Connick, supra,* at 143[.]
> ....
> At the same time, the Court has recognized that a citizen who works for the government is nonetheless a citizen. .... So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.  See, *e.g., Connick, supra,* at 147[.]

<u>Garcetti</u>, 126 S.Ct. at 1958.

"Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'"  <u>Id.</u>, at 1959, *citing* <u>Connick</u>, 461 U.S. at 154.  The Supreme Court reversed the Ninth Circuit's decision, instructing that it was not dispositive that Ceballos expressed his views inside his office rather than publically, nor that the memo concerned the subject matter of his employment.  <u>Id.</u>

-11-

> The controlling factor in Ceballos' case is
> that his expressions were made pursuant to his
> duties as a calendar deputy. [] That
> consideration - the fact that Ceballos spoke
> as a prosecutor fulfilling a responsibility to
> advise his supervisor about how best to
> proceed with a pending case - distinguishes
> Ceballos' case from those in which the First
> Amendment provides protection against
> discipline. We hold that when public
> employees make statements pursuant to their
> official duties, the employees are not
> speaking as citizens for First Amendment
> purposes, and the Constitution does not
> insulate their communications from employer
> discipline.

Id., 1959-60.  The Supreme Court further explained:

> When an employee speaks as a citizen
> addressing a matter of public concern, the
> First Amendment requires a delicate balancing
> of the competing interests surrounding the
> speech and its consequences.  When, however,
> the employee is simply performing his or her
> job duties, there is no warrant for a similar
> degree of scrutiny.  To hold otherwise would
> be to demand permanent judicial intervention
> in the conduct of governmental operations to a
> degree inconsistent with sound principles of
> federalism and the separation of powers.

Id., at 1961.

This court understands the Supreme Court's Garcetti decision
to address the fundamental element of a §1983 violation - whether
the plaintiff was deprived of a right or interest secured by the
Constitution or laws of the United States.   Garcetti instructs
that as a matter of law, if the speech was made pursuant to his or
her official duties the plaintiff was not deprived of a

-12-

Constitutional or statutory right.  It is irrelevant whether that speech involved a matter of public concern, and it is not necessary to reach the four part analysis for an employment retaliation claim.[11]

The threshold question before this Court, then, is whether DeVille's speech - his communications to the USDOT Office of Inspector General regarding the alleged appearance of corruption and financial mismanagement of state and federal funds provided to the RTA - were statements made pursuant to his official duties as an employee of RTA/TMSEL.  RTA argues that taking the allegations and statements in DeVille's Complaint and the documents identified in his Complaint as true, his speech was clearly made pursuant to his official duties.  The Court agrees.

At ¶10, DeVille's Complaint states:

> Beginning in October of 2005, Plaintiff was asked to communicate with the Office of Inspector General concerning financial issues of the RTA, including but not limited to, the management of the Emergency Ground Transportation Contract issued by the FTA and funded by FEMA.

The Complaint further claims, at ¶¶12-15, that the FTA had "strongly requested" that RTA use the Capital Area Transportation System ("CATS") computer systems in Baton Rouge to manage the EGTC

---

[11]*See supra*, p. 9; <u>Modica v. Taylor</u>, 465 F.3d 174, 179-80 (5th Cir. 2006).

flow of funds because the RTA computer systems were destroyed in the flood; that Major refused to use any computerized system and "insisted" on manual financial management of the EGTC, which caused "grave concerns" in the FTA and the USDOT Office of Inspector General; and that DeVille "was in favor of computerizing the financial record keeping and reporting that was required by the FTA to maintain and receive the full potential value" of the EGTC.[12] DeVille argues that his speech was not pursuant to his official job duties because it was not part of his job responsibilities nor in his job description to report the appearance of financial corruption and/or actual financial corruption occurring in the RTA to the USDOT Office of Inspector General, or to any other federal or state agency.[13] He further argues that his speech addressed matters of public concern and was not destructive to RTA's operations.[14]

DeVille attempts to distinguish the facts of his case from Garcetti, Freitag v. Ayers, 468 F.3d 528 (9th Cir. 2006), and Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689 (5th Cir. 2007). In each of these cases, the challenged speech was not protected because it was *internal* to the employer - that is, between the

---

[12]Complaint, ¶14.

[13]*See* Complaint, ¶24.

[14]*See* Complaint, ¶30.

-14-

employee and the employer.  He argues that his speech is different
because it was directed to the USDOT Office of the Inspector
General, not to another department or supervisor within the
RTA/TMSEL organization.   Instead, DeVille compares his
communications with those in Modica, supra, Beniot v. Board of
Comm's for the New Orleans Levee District, 459 F.Supp.2d 513
(E.D.La. 10/27/2006), and Charles v. Texas Lottery Commission, 2006
WL 3358420 (W.D.Tex. 11/17/2006).

The Modica case was decided by the Fifth Circuit three and a
half months after the Supreme Court decided Garcetti, but Garcetti
was not mentioned and apparently was not applied to that case.
Carolyn Modica began working for the Texas Cosmetology Commission
("TCC") in 1990.  Modica, 465 F.3d at 177.  In 2000, she and other
TCC employees sent a letter to the chairman of the TCC expressing
concerns about the demotion of their supervisor, and attended a
meeting of the TCC where she addressed the commissioners regarding
the supervisor's demotion and other personnel issues including her
concerns that the Executive Director had instructed inspectors to
report their numbers incorrectly.  Id.  Subsequently, she was
denied a merit pay raise and a promotion.  In May 2002, she sent a
letter to a Texas state representative in which she accused the TCC
and its Executive Director of eight specific instances of
wrongdoing.  Id. at 177-78.  In June 2002, Modica met (by

-15-

telephone) with the new Executive Director[15] who had been assigned to respond to Modica's complaints.  Modica claimed that shortly after that meeting the new Executive Director began retaliating against her by "micromanaging her schedule and requiring her to travel long distances to perform inspections."  Id., at 178.  In November 2002, Modica filed suit against the new Executive Director and others alleging First Amendment retaliation pursuant to § 1983.  She was later terminated and amended her suit to allege wrongful termination in retaliation for exercising her First Amendment rights.  Id.

The Fifth Circuit's analysis focused on the second element of the four part test for a First Amendment retaliation claim to determine whether her speech involved a matter of public concern by considering the content, form and context of the speech.  Id. at 180.  The Fifth Circuit found that her speech was protected because although Modica's letter to the state representative addressed some private employer/employee issues: the content was primarily public because it largely addressed her employer's malfeasance; that its form, a letter to a state representative, "militates in favor of protection"; and that the context of the speech also favored protection because the majority of her concerns related to the

---

[15]The former Executive Director had died and been replaced.

operation of the TCC as a whole.  <u>Id.</u>, at 180-81.

In <u>Beniot</u>, the plaintiff was employed by the Board of Commissioners of the Orleans Levee District ("the Board") as senior counsel.  On September 27, 2005, he hand delivered a letter to Governor Kathleen Blanco concerning the manner in which the levee district officials spent their time and taxpayers' money in the months prior to Hurricane Katrina, including a $96,000 payment to the former president of the Board until his resignation on July 8, 2005.  <u>Beniot</u>, 459 F.Supp.2d at 515.  On September 30, he provided United States Senator David Vitter with a copy of the letter.  <u>Id.</u> After Beniot was transferred to temporary offices outside of New Orleans and excluded from many of the Board's activities, on November 9, 2005, he was suspended.  The Board reported to the press that Beniot was suspended because he had threatened another employee.  <u>Id.</u> at 516.  In December, Benoit involuntarily resigned his position under pressure from the Board's contract attorney. <u>Id.</u>  Beniot filed a civil rights action pursuant to § 1983 against the Board and others, alleging employment retaliation for his writing the letters critical of the Board.  <u>Id.</u>  Citing <u>Garcetti</u>, the district court concluded that Beniot's speech was protected.[16] The court reasoned that Beniot spoke as a citizen exposing

_____

[16]<u>Beniot</u> was decided five months after <u>Garcetti</u>.  The matter was before the district court on defendants' motion to dismiss for failure to state a claim and lack of subject matter jurisdiction.

misconduct and malfeasance when he wrote the letters to Governor Blanco and Senator Vitter, and was not acting as a senior counsel - doing his job for the Board - "because it was not part of his duties to expose misconduct and illegal misuse of time and taxpayer's funds and to provide information to the Governor or the Senator." Id., at 518.

In the Charles case, the plaintiff had been employed by the defendant Texas Lottery Commission ("the Commission") as a computer systems analyst. 2006 WL 3358420, *1 (W.D.Tex.). Charles became frustrated with what he believed to be the Commission's misuse of government funds, violation of the Texas Open Records Act, and racial discrimination at the Commission. Id. After receiving no response to his complaints to the Commission's upper-management, he sent an email detailing his concerns to some members of the Texas Legislature, copied to Gary Grief's[17] and an institutional Commission's email addresses. Id. Two days later, after meeting with his supervisor and a human resources manager, he was fired. He brought suit alleging, inter alia, that his termination was in retaliation for the exercise of his First Amendment rights. Id. Like the district court in Beniot, the Charles court applied the

---

[17]Gary Grief is named as a defendant individually and in his official capacity, which is not identified. The case, decided six months after Garcetti, was before the district court on Grief's motion for summary judgment on his claim for qualified immunity.

<u>Garcetti</u> decision to its analysis of the second element of the four part employment retaliation framework cited by the Fifth Circuit in the <u>Modica</u> case.   The court first observed that Charles' email "regarded matters of public concern: official misconduct in allegedly misappropriating millions of taxpayer dollars, and alleged institutional race discrimination are, almost needless to say, matters of public concern." <u>Charles</u>, at *4.   Grief argued that because the email was work-related and part of Charles' job duties at the Commission, his First Amendment claim was barred by <u>Garcetti</u>.   <u>Id.</u>   Finding that the email related to a matter of public concern and was not part of Charles' official duties, the district court observed that:

> [It is] difficult to swallow the assertion that part of Plaintiff's regular job duties was to send emails to Texas state legislators reporting on the status of the Disaster Recovery Site, much less that it included reporting such things as his employer, the Commission, misspending (or misappropriating) millions of dollars on a phantom Disaster Recovery Site and hiding this information from the public.
> ....
> Grief thus misconceives the rule set out in *Garcetti*.   It is not whether the speech was "work-related" but whether Plaintiff wrote the email in his capacity as a computer systems analyst.

<u>Id.</u>   The court further observed that although the email did reference Charles' status as a Commission employee, that reference

-19-

was intended to give his allegations more credibility, and that the email was sent from a private email address and gave Charles' home address, home telephone and his cell phone numbers.  Id.

DeVille also attempts to distinguish his situation from that in Casey v. West Las Vegas Indep. Sch. Dist., 473 F.3d 1323 (10th Cir. 2007), cited by RTA in support of its argument.  Casey was hired as Superintendent of the School District in January, 2002. Id. at 1325.  Her job responsibilities included oversight of the District's Head Start program, in which she discovered serious irregularities. Id.  She reported the problems to the School Board which told her "to leave it alone, or not to go there". Id., at 1326.  Against the instructions of the Board, Casey contacted the regional Head Start authorities to convey her concerns about the legality of the District's Head Start program.  Id.  After the Board ignore her warning that it was violating the New Mexico Open Meetings Act, she filed a written complaint with the New Mexico Attorney General's office which ordered corrective action after its investigation determined that Casey was correct.  Id.  In 2003, the School District demoted her to Assistant Superintendent, then refused to renew her contract.  Id.  She sued alleging that she was dismissed in retaliation for exercising her First Amendment rights.

The Tenth Circuit affirmed the district court's denial of defendants' motion for summary judgment on the issue of qualified

-20-

immunity.    Applying  the  recent  <u>Garcetti</u>  decision  to  determine
whether  Casey's  speech  was  a  matter  of  public  concern,  the  Court
concluded  that  her  speech  regarding  the  Head  Start  program,
including  her  communication  to  the  Head  Start  Regional  Office  in
Dallas,  was  not  protected  because  it  was  "more  akin  to  that  of  a
senior  executive  acting  pursuant  to  official  duties  than  to  that  of
an  ordinary  citizen  speaking  on  his  or  her  own  time."   <u>Id.</u>,  at
1331.   The  Court  observed  that  employees  have  an  obligation  to
report  an  employer's  improprieties  in  the  handling  of  federal
funds,  and  "that  the  responsibility  to  deal  with  known  misconduct
can  be  no  less  emphatic  when  the  employee  at  issue  is  a  CEO[18]  or
Superintendent  and  similar  disclosure  obligations  exist."   <u>Id.</u>  at
1332.   The  Court  concluded  that  her  contact  with  the  New  Mexico
Attorney  General's  office  may  be  protected  speech  because  she  was
not  seeking  to  fulfill  her  professional  responsibility  to  advise
the  Board;  rather,  she  had  lost  faith  in  the  Board  so  she  took  her
grievance  to  the  Attorney  General.   <u>Id.</u>

        DeVille  argues  that,  like  the  plaintiffs  in  <u>Modica</u>,  <u>Beniot</u>,
<u>Charles</u>  and  <u>Casey</u>,  he  was  exposing  corruption  and  malfeasance
within  his  workplace,  and  that  doing  so  was  certainly  not  within
his  job  duties,  therefore  his  speech  is  protected  even  under  the

---

[18]Casey's  title  included  CEO  of  the  District's  Head  Start  program.

<u>Garcetti</u> analysis.   The argument is not persuasive.

The <u>Garcetti</u> Court did not articulate "a comprehensive framework for defining the scope of an employee's duties" in order to determine whether a plaintiff's challenged speech was made pursuant to his/her official duties. <u>Garcetti</u>, at 1961.  It did, however, reject "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." <u>Id.</u>

> The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

<u>Id.</u>, at 1961-62.  Unlike the plaintiffs in <u>Modica</u>, <u>Beniot</u>, <u>Charles</u> and <u>Casey</u>, each of whom ultimately communicated with elected or appointed officials outside of their employment structure regarding work-related issues, including allegations of corruption and malfeasance, DeVille's communications were within the scope of his job duties although the Office of Inspector General was not part of the RTA/TMSEL organizational structure.   Like the plaintiff in <u>Casey</u> when she reported noncompliance in the Head Start program to federal Head Start authorities, as a senior executive in the RTA (whether as General Manager of the RTA/TMSEL or Executive Director

-22-

of Capital Recovery for RTA), DeVille's positions surely included some responsibility for oversight of the financial management of the federal and state tax funds provided to the RTA, as well as an obligation to report his concerns regarding financial mismanagement to the appropriate federal authorities even in the face of the board's disapproval.   That is exactly what he did.  Unlike <u>Casey</u>, when the plaintiff reported violations of the Open Meetings Act to the Attorney General, DeVille did not step out of his official role as an RTA/TMSEL employee to report illegalities to outside authorities who had no connection to his employment.

No job description or organization chart has been produced, but DeVille has acknowledged that part of his job was to communicate with the USDOT Office of Inspector General regarding financial matters concerning the RTA.  Based on the allegations in his Complaint, this is what he was doing via his office email and meetings, whether by telephone or in person, with persons in the USDOT Office of Inspector General during his office hours.  The "form" and "context" of his communications are not only "work-related", they were part of his official duties, even if the "content" - allegations of the appearance of corruption and financial mismanagement of taxpayers funds within the RTA - had not been specifically authorized by the RTA board and/or the General Manager at the time they were made.  The Court finds that DeVille's

-23-

communications with the USDOT Office of Inspector General were part of his official duties and are not protected by the First Amendment.  His § 1983 claim against RTA and TMSEL must be dismissed.[19]

## II.

To prevail on a claim for defamation, a plaintiff must prove four elements: (1) a false or defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault on the part of the publisher; and (4) resulting injury. Singleton v. St. Charles Parish, 833 So.2d 486, 496 (La.App. 5 Cir. 11/26/02), *writ denied,* 839 So.2d 44 (La. 3/14/03), *citing* Trentcosta v. Beck, 703 So.2d 552, 559 (La. 10/21/97).  In Sassone v. Elder, 626 So.2d 345 (La. 1993), two attorneys filed a defamation action against Bill Elder, an investigative television reporter, and his employer television station.  The attorneys claimed damages based on allegedly defamatory remarks about them

---

[19]DeVille further argued that Garcetti is not dispositive because Ceballos claimed that he exercised his First Amendment rights by: (1) submitting the memorandum; (2) discussing the matter with his supervisors; (3) testifying truthfully about the warrant at the hearing; and (4) speaking publically about the matter at a Mexican-American Bar Association meeting. DeVille Memorandum in Opposition, r.d. #49, citing Garcetti, 126 S.Ct. at 1972 (Souter, J., dissenting).  He argues that the only issue before the Supreme Court (because the Ninth Circuit only addressed that issue) was the memorandum that had been written as part of his official duties, and that the opinion did not address whether actions 2 - 4 above were protected.  The argument is immaterial because DeVille's Complaints do not allege that he discussed his concerns with his supervisors, that he testified before any hearing (although he met with Mary Thomas and other agents of the Office of the Inspector General, which falls within the ambit of his official duties), or that he spoke publically about his concerns.

during the television station's televised reports of an investigation of the activities of the attorneys' client, Marie Giordano Lloyd,[20] who along with hundreds of other heirs of Juan Ronquille contracted with the attorneys to recover title to mineral-rich lands in Plaquemines Parish from the State of Louisiana. Id. at 347. In early 1986, several disgruntled class members (potential heirs) contacted Mr. Elder, who began an investigation into Lloyd's activities. He interviewed other heirs and Douglas Greenburg, the district attorney of Terrebonne Parish where a grand jury was conducting an investigation into Lloyd's activities, and he attended a May 1986 meeting of the heirs arranged by Lloyd and her attorneys (the plaintiffs) for the purpose of revising contracts between Lloyd and the other heirs. The series of investigative reports aired between June 1 and July 7, 1986, showing clips of the May meeting and edited portions of Elder's interviews with the heirs and with Greenburg, as well as comments by Elder on the investigation. Id. at 347-48. The defamation lawsuit followed.

The appellate court reversed the trial court's grant of summary judgment on the defamation claim. Id. at 347. The Louisiana Supreme Court granted writs, reversed the appellate court

---

[20]Lloyd was later indicted for fraud.

-25-

and reinstated the trial court's dismissal of the defamation claim.
The Supreme Court stated the law as follows:

> A defamatory communication is one that tends
> to harm the reputation of another so as to
> lower him in the estimation of the community
> or to deter third persons from associating or
> dealing with him.   Restatement (Second) of
> Torts § 559 cmt.e (1977).   The question of
> whether a communication is capable of a
> particular meaning and whether that meaning is
> defamatory is one for the court.[] Gussie v.
> Lowenthal, 535 So.2d 378, 382 (La. 1988); []
> That question is answered by determining
> whether a listener could have reasonably
> understood the communication, taken in
> context, to have been intended in a defamatory
> sense.   2 F. Harper et al, *The Law of Torts* §
> 5.4(2d ed. 1986).

626 So.2d at 352 (footnote and other citations omitted).   The

Sassone Court described plaintiffs' claim as "defamation by

innuendo" in which the Court must distinguish between statements of

fact and statements of opinion.   Id. at 353.

> [I]f the defendant states non-defamatory facts
> on which he bases his derogatory opinion, he
> is not liable for defamation unless the
> opinion indicates the existence of other facts
> which are defamatory and would justify the
> forming of the opinion. [] But if the
> defendant states a derogatory opinion without
> disclosing the facts on which it is based, he
> may be liable for defamation if the comment
> creates the reasonable inference that the
> opinion is justified by the existence of
> undisclosed defamatory facts.

Id. (citations omitted).   The Supreme Court concluded that even if

the report was not necessarily fair and arguably distorted,

-26-

considering the report in its entirety it could not be understood by a reasonable and detached viewer so as to harm plaintiffs' reputation or to lower their esteem within the community, and did not constitute defamation as to the plaintiffs.  Id. at 355.

DeVille claims that certain named RTA/TMSEL employees and RTA board members made the following defamatory statements to reporters for the *New Orleans Times Picayune*, which were published by the newspaper on June 14, 2006: that he was "under fire from several RTA commissioners who have questioned his decision to extend a contract ... without board approval" and that "some RTA officials also have called attention to a $175-an-hour agreement Deville signed with a consulting firm....".  He claims the following, published on October 27, 2006, are defamatory: that "Bill Deville, the Regional Transit Authority's former general manager, has been fired four months after he was demoted amid criticism from RTA board members....", and that "[f]ormer RTA Chairman Jimmy Reiss removed Deville from the general manager's position in June following months of criticism by other RTA commissioners, who questioned Deville's decision to extend a contract ... without board approval", and finally, that "[a]t the time, Reiss said the shake-up in the RTA's top management had nothing to do with his

-27-

relations with other board members."[21]

RTA and TMSEL argue that DeVille has failed to adequately plead defamation sufficient to give fair notice to each defendant of all claims and the grounds on which they rest.  The Court does not reach defendants' argument because it finds that the statements DeVille complains about are not defamatory as a matter of law.

The first statements comprise a two sentence paragraph in a lengthy article published in the *Times Picayune* on June 14, 2006. He argues that the statements claiming that he had extended a contract without board approval and that some RTA officials also have called attention to a $175-an-hour consulting agreement that he had signed were false, and were stated with actual or implied malice to injure his business reputation "by stating and implying that his actions for the RTA were dishonest, lacked business integrity, were poor business decisions and/or were unauthorized business actions."[22]  To the contrary, the court finds that these are statements of opinions based on non-defamatory facts.

The complete article was a report regarding the "grim reality" of the task facing the cash-strapped RTA in trying to rebuild the public transportation system in post-Katrina New Orleans.   It

---

[21]See Supplemental and Amended Complaint, ¶¶67-70.

[22]Supplemental and Amended Complaint, ¶68.

-28-

described at length recommendations in a report by a consulting firm that the RTA cut more personnel and routes to reduce expenses, and among other things, change its top management structure by moving DeVille from his position as General Manager to a new position, Executive Director of Capital Recovery and appoint Mark Major General Manager.  Taken within the context of the entire article, the statements do not claim or imply that DeVille is dishonest or lacked business integrity, but that at least several board members did not approve of his extension of a particular contract (even assuming that he had the authority to do so) or of his signing a $175-an-hour consulting agreement.  The board members expressed dissatisfaction with his performance of his official duties based on specific decisions he made.  The comments are not defamatory.

     The Court's conclusion is the same regarding the challenged comments in the *Times Picayune* article published on October 27, 2006, which dealt exclusively with DeVille's termination and is shorter that the June 14 article, although it did reiterate the statements it that article that Deville claims are defamatory. DeVille alleges that the statements made by certain RTA board members and employees "were meant to state and imply plaintiff was 'criticized,' then 'demoted' then 'fired' due to misconduct, dishonesty, action that lacked business integrity, poor business

decisions and/or due to unauthorized business actions."[23]  DeVille cannot dispute that he was in fact "fired", and "criticized" by the RTA board.  Whether his change in position four months earlier was a "demotion" or simply a lateral movement is a matter of opinion. Neither can he dispute that some RTA board members were dissatisfied with his decisions and actions during his tenure as General Manager and Executive Director of Capital Recovery for the RTA, or that they expressed that disapproval of those specific acts or decisions to a reporter.  The newspaper article also explained that the RTA board approved "a stringent, new contract review procedure that will require the agency's executive staff to brief them on details of all future contracts."

Considering the challenged comments within the context of the entire article, they do not imply that DeVille was dishonest, was guilty of misconduct, or that he lacked business integrity. Whether his actions and decisions reflect poor business decisions or unauthorized business actions is a matter of opinion based on non-defamatory facts.  An employer's criticism of an employee's performance of his official duties is not defamation *per se*.  If any criticism by an employer of the job performance of an employee gave rise to a defamation claim, surely the efficient management

---

[23]Supplemental and Amended Complaint, ¶69.

and administration of all businesses would be impaired and the workplace would be enmeshed in endless litigation. DeVille's defamation claim must be dismissed.

III.

DeVille claims that RTA is liable for breach of his employment contract. His Complaint alleges that he was promised a contract with a 2½ year term of employment at $125,000 per year, plus specified benefits, as Executive Director of Capital Recovery for RTA; that the RTA board approved the terms of the contract on or about June 14, 2006; that RTA provided him with a document commemorating the terms of the contract; and that if the RTA board meeting minutes do not reflect approval of the contract, the minutes are inaccurate or have been redacted to omit such references; and that Jimmy Reiss and other RTA board members will testify that the board approved the "fixed term position".[24]

Under Louisiana law, when a contract amount exceeds $500, the proponent of an oral contract bears the burden of establishing a prima facie case that the contract exists with "the testimony of at least one corroborating witness and other corroborating circumstances." La. Civ. Code art. 1846; Kethley v. Draughon Business College, 535 So.2d 502, 505 (La.App. 2d Cir. 1988); Hunt

---

[24]Complaint ¶¶ 38-41; Amended Complaint, ¶¶ 71-74.

<u>Oil Co. v. FERC</u>, 853 F.2d 1226, 1240 (5th Cir. 1988).  The existence of a corroborating circumstances and a credible witness is a question of fact.  <u>Hunt</u>, at <u>id.</u>  DeVille has stated a claim against RTA for breach of contract sufficient to withstand a Rule 12(b)(6) motion to dismiss.

IV.

DeVille's Amended Complaint also states a procedural due process claim alleging deprivation of his property right in continued employment, and equal protection in violation of 42 U.S.C. § 1983.  He alleges that the adverse actions by RTA and defendant Mark Major amount to a "taking" of his property "under the color of law" pursuant to § 1983, and that he was denied the "minimum and essential requirements of procedural due process..., such as notice and an opportunity to respond at a meaningful time and in a meaningful manner."[25]

In order to establish either a substantive or a procedural due process property right, a plaintiff "must first establish a denial of a constitutionally protected property right."  <u>Bryan v. City of Madison, Mississippi</u>, 213 F.3d 267, 274 (5th Cir. 2000).  Such a showing must be made in reference to state law.  <u>Id.</u>, at 275, *citing* <u>Schaper v. City of Huntsville</u>, 813 F.2d 709 (5th Cir. 1987);

_____

Amended Complaint, ¶¶81-84.

-32-

*and* <u>Bishop v. Wood</u>, 426 U.S. 341, 344, 96 S.Ct. 2074 (1976)(stating that "a property interest in employment can, of course, be created by ordinance or by an implied contract ... in either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law.") DeVille's complaints allege an employment contract with the RTA, which the RTA breached without due process. He has stated a procedural due process claim sufficient to survive a Rule 12(b)(6) motion to dismiss.

As a prerequisite to an equal protection claim pursuant to the Fourteenth and Fifth Amendments, a plaintiff must show that he or she was treated differently from similarly situated individuals. <u>Bryan</u>, 213 F.3d at 276.   Neither the original or the amended Complaint states any allegations that RTA treated him any differently than similarly situated individuals.   DeVille's claim that RTA violated his equal protection rights must be dismissed.

<u>**CONCLUSION**</u>

The Court notes that DeVille states a claim for breach of contract or violation of his due process rights only against RTA, not against TMSEL.   His § 1983 retaliation claim and the defamation claim are brought against both RTA and TMSEL.

Considering the foregoing discussion:

**IT IS ORDERED** that defendant Mark Major's motions to dismiss (r.d. #s 11, 40) are **GRANTED, DISMISSING WITH PREJUDICE** all of

-33-

plaintiff's claims against Mark Major in his individual capacity; and,

**IT IS FURTHER ORDERED** that defendant TMSEL's motions to dismiss (r.d. #s 13, 44) are **GRANTED, DISMISSING WITH PREJUDICE** plaintiff's claims against TMSEL pursuant to 42 U.S.C. § 1983 for employment retaliation in violation of his First Amendment rights (COUNT I) and for defamation pursuant to Louisiana law (COUNT III);

**IT IS FURTHER ORDERED** that defendant RTA's motions to dismiss (r.d. #s 10, 39) are **GRANTED IN PART, DISMISSING WITH PREJUDICE** plaintiff's claim against RTA pursuant to 42 U.S.C. § 1983 for employment retaliation in violation of his First Amendment rights (COUNT I), for defamation pursuant to Louisiana law (COUNT III), and for violation of his equal protection rights under the Fourteenth Amendment; and

**IT IS FURTHER ORDERED** that defendant RTA's motions to dismiss plaintiff's breach of contract claim and procedural due process claim are **DENIED.**

New Orleans, Louisiana, this 22nd day of January, 2008.

**MARCEL LIVAUDAIS, JR.**
**Senior United States District Judge**

-34-